No. 82,380

STATE OF KANSAS, *Appellee,* v. ANTHONY D. CONLEY, *Appellant.*

(11 P.3d 1147)

Opinion filed October 27, 2000.

*Mary Curtis,* assistant appellate defender, argued the cause, and *Kirk C. Redmond,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, were with her on the briefs for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *David Lowden,* assistant district attorney, *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Six, J.: Defendant Anthony Conley appeals his jury conviction for first-degree premeditated murder. K.S.A. 21-3401(a). He received a hard 40 sentence under K.S.A. 21-4638. Conley contends that the district court erred: (1) by declaring a witness unavailable in violation of his confrontation and due process rights, (2) in refusing to give an instruction on informant testimony, (3) by allowing the State's peremptory challenges during voir dire, and (4) by imposing a hard 40 sentence. Finally, although the issue was not raised in the district court, we address Conley's contention that his hard 40 sentence is unconstitutional. Conley claims his sentence violates the Due Process Clause of the United States Constitution. He also claims his sentence violates his right to trial by jury under the 6th Amendment to the United States Constitution and § 5 of the Kansas Constitution Bill of Rights.

Our jurisdiction is under K.S.A. 21-4627 (a conviction resulting in a hard 40 sentence receives an automatic review by this court).

Finding no error, we affirm. We also uphold the constitutionality of Conley's hard 40 sentence.

## FACTS

Conley was convicted of the murder of Nicholas Armstrong. Armstrong was shot four times, sustaining five wounds. On the evening of September 26, 1995, Melissa Eckels, who lived across the parking lot from Conley, visited her brother Travis Scott, her cousin defendant Conley, and her friend Armstrong. The three men lived together. When Eckels arrived, Scott, Conley, and Armstrong were playing a video game and listening to music. Eckels noticed an object that she believed was a gun on top of the television. She returned to her apartment at about 10:30 p.m. Marilyn Noel lived in a neighboring apartment complex. She testified that around 10:45 p.m. that night, she heard five or six gun shots (two or three in two sessions and one final shot.)

A few minutes later, Gretchen Macy-Toro, a friend of Armstrong, walked out of her apartment. She saw Armstrong's Ford Bronco drive by. Although she could not see who was inside the Bronco, she thought it was unusual that the vehicle did not stop. In the past, Armstrong frequently stopped to talk when he drove

past Macy-Toro's residence. Also, he usually played loud music. Macy-Toro did not hear any music coming from the Bronco. The next morning, Joseph Noble, a neighbor, was driving to work when he discovered Armstrong's body. Investigators found two .38 caliber shell casings near the body.

A forensic pathologist testified that Armstrong was wounded in the forehead, mouth, chest, back, and right buttock. Although the pathologist could not ascertain the order that the shots were fired, he concluded that the shot to the forehead caused Armstrong's death.

The police located Armstrong's Bronco about 4 miles from Conley's apartment. A bullet hole was in the driver's door. A crime scene investigator testified that due to the trajectory of the bullet, the shot was fired when the door was open. Investigators found 17 fingerprints but no blood on the Bronco. Two of the prints belonged to the victim. None of the prints were Conley's.

Four months later, Conley and Scott were passengers in a car stopped by the police near Coffeyville, Kansas. The police found a .45 caliber handgun behind the driver's seat and a loaded .38 caliber handgun in the cargo area. Ballistic tests showed that the bullets found in Armstrong's neck and leg and the shell casings found near his body were fired from this .38 caliber handgun.

In February 1997, Conley was imprisoned on another charge and shared a cell with inmate Larry Luckey. Luckey told officials that Conley confessed to Armstrong's murder. At trial, Conley testified in his own defense. He said that he lived alone; however, Armstrong (the victim) kept a few items at Conley's apartment. According to Conley, Armstrong visited the apartment on the night of the murder and left by himself between 10:30 and 11:30 p.m. Conley said he watched a video alone and then ordered a pizza, which arrived between 12:30 and 1 a.m. He denied any knowledge of Armstrong's murder. A jury found Conley guilty of premeditated first-degree murder. At the sentencing hearing, the district court sentenced Conley to a hard 40 sentence.

## DISCUSSION
### The Unavailable Witness

We first address Conley's claim that the district court erred when it found that Eckels was unavailable as a witness. Her preliminary

hearing transcript was used as evidence at trial. The district court's determination that a witness is unavailable to testify will not be disturbed on appeal absent an abuse of discretion. *State v. Love,* 267 Kan. 600, 609, 986 P.2d 358 (1999). Judicial discretion is abused when no reasonable person would take the view adopted by the district court. *State v. Davidson,* 264 Kan. 44, 56, 954 P.2d 702 (1998). We find no abuse of discretion here. K.S.A. 1999 Supp. 60-460(c)(2) allows "the use of preliminary hearing testimony in a trial of the same action if the declarant is unavailable at the trial and the adverse party had the right and opportunity to adequately cross-examine at the preliminary hearing." *State v. Zamora,* 263 Kan. 340, 342, 949 P.2d 621 (1997).

Under K.S.A. 60-459(g)(3), a witness may be unavailable when the witness is "unable to be present or to testify at the hearing because of death or then existing physical or mental illness." The standard for determining whether a witness is unavailable is whether there has been a good faith effort to obtain the witness' presence at trial. *Zamora,* 263 Kan. at 342. The question of a good faith effort turns on the totality of the facts and circumstances of the case. 263 Kan. at 342.

Here, Conley argues that the State did not make a "good faith effort," or use "reasonable diligence" in attempting to produce Eckels for trial. The State filed a pretrial motion seeking to have Eckels declared unavailable and to have her preliminary hearing testimony admitted at trial. At the hearing on the motion, the State produced a notarized letter from Eckels' Arizona physician. The physician's letter reported that Eckels (she is referred to as Anderson in the letter) delivered a child by caesarean section on July 15, 1998, and, barring any medical complications, she would not be able to travel until August 26, 1998. (The trial commenced August 4, 1998.) No other evidence was offered.

Conley, relying on *State v. Calvert,* 211 Kan. 174, 505 P.2d 1110 (1973), *State v. Steward,* 219 Kan. 256, 547 P.2d 773 (1976), and *State v. Stafford,* 255 Kan. 807, 878 P.2d 820 (1994), contends that the physicians's letter alone is insufficient to show unavailability.

A review of the three cases is appropriate. In *Calvert,* during Calvert's third trial, the district court prohibited the reading of

Darlene Coffee's testimony. Coffee had testified for the defense as an alibi witness at Calvert's second trial. After the State rested, Calvert's counsel told the court that Coffee called to say that she was unable to testify based on her doctor's orders. The district court ruled that in order to admit Coffee's prior testimony, the doctor would have to call the prosecutor regarding Coffee's excuse for failing to appear. The doctor never called. Thus, the district court excluded Coffee's prior testimony. We affirmed. Calvert failed to make the showing required by the district court. 211 Kan. at 183.

In *Steward*, the State successfully moved to present a witness' prior testimony. At a hearing on the motion, the assistant district attorney and an investigator testified that they spoke to the witness and to her doctor. They said the doctor performed a physical examination and determined that the witness could not travel due to her being in the late stages of a difficult pregnancy. On appeal, we affirmed, noting that there was no lack of diligence and no indication of bad faith on the part of the State. We pointed out that Steward neither asked for a continuance nor complained of the cross-examination of the witness at the first trial. 219 Kan. at 264.

In *Stafford*, the district court declared a cancer patient unavailable to testify. After the preliminary hearing, the witness was diagnosed with cancer of the liver. The witness wished to forego treatment and, instead, asked to receive medication for pain management. At the time of the trial, the witness was taking numerous medications 24 hours a day. As a result of the medications, she experienced some hallucinations and memory loss. The witness' doctor testified regarding the issue of availability. We concluded that there was no abuse of discretion in allowing the witness' prior testimony into evidence. 255 Kan. at 813-14.

Conley asserts that *Calvert, Steward,* and *Stafford* require a doctor's testimony or other additional evidence to satisfy the requisite reasonable diligence standard. We disagree. These cases do not establish such a strict requirement.

Here, Eckels had delivered a baby by caesarean section less than 3 weeks before trial. Her physician's notarized letter said Eckels "is medically unable to travel the week of 8/3-7/98." Moreover,

Conley did not ask for a continuance. The facts do not show a lack of reasonable diligence on the part of the State, nor do they show bad faith. A reasonable person would agree with the district court's decision to declare Eckels unavailable as a witness. We find no error in admitting Eckels' preliminary hearing testimony.

## The Right to Confrontation

Next, Conley asserts his right to confrontation was violated when the district court allowed Eckels' preliminary hearing testimony into evidence. Conley fails to acknowledge that Eckels was subjected to cross-examination during the preliminary hearing. We have interpreted *Ohio v. Roberts*, 448 U.S. 56, 70, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), to say that the opportunity to cross-examine at a prior hearing satisfies the Sixth Amendment right of confrontation, even absent actual cross-examination. *State v. Humphrey*, 258 Kan. 351, 370, 905 P.2d 664, *modified on other grounds* 258 Kan. 372, 905 P.2d 664 (1995).

Conley contends he was denied effective cross-examination because (1) at the preliminary hearing he did not have the witnesses' statements to police and (2) certain pizza delivery alibi evidence was not "developed" until after the preliminary hearing. At the preliminary hearing, Conley did not object because he did not have the witnesses' statements to police. The statements themselves are not in the record; thus, we are unable to determine their impeachment value. As the State points out, defense counsel's questions to Eckels indicate an awareness of inconsistencies in her story. After Eckels testified that she saw a gun on top of Conley's television on the night of the murder, defense counsel asked, "You told Miss McIntire that you weren't sure what the black object was?" Counsel then said, "You also stated before that you weren't sure what the black object was either." Eckels replied in the affirmative.

With regard to the pizza delivery alibi defense, Conley does not explain why he failed to inform his attorney of this alibi until after the preliminary hearing. Conley has made no showing that the absence of the statements or alibi defense was harmful in any way. From our review of the record, we conclude Conley was not denied his right to confront Eckels.

Conley argues that Eckels' prior testimony is hearsay and lacks an adequate indicia of reliability. However, under K.S.A. 60-460(c)(2), Eckels' prior testimony is excepted from the hearsay rule.

Conley also claims that his due process rights were violated when the district court excluded certain inconsistent statements made by Eckels. He specifically asserts that the court erroneously excluded exculpatory evidence. Again, we do not agree. Conley fails to demonstrate how Eckels' statements to police were exculpatory. Conley argues that Eckels gave "inconsistent statements on material matters, such as her description of the gun that she described as being in Mr. Conley's possession prior to the murder." The record does not support Conley's claim that his due process rights were violated.

### The Jury Instruction on an Informant's Testimony

Next, Conley asserts that the district court erred in failing to include PIK Crim. 3d 52.18-A in the instructions given to the jury. This contention also lacks merit.

PIK Crim. 3d 52.18-A says:

"You should consider with caution the testimony of an informant who, *in exchange for benefits from the State*, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence." (Emphasis added.)

The PIK "Notes on Use," referencing 52.18-A, advises: "It is error to refuse to give this instruction when requested." (citing *State v. Fuller*, 15 Kan. App. 2d 34, 39-41, 802 P.2d 599 [1990], *rev. denied* 248 Kan. 997 [1991].) However, here, the district court found that PIK Crim. 3d 52.18-A was not warranted. A review of the facts supports the district court's ruling. In 1997, Larry Luckey wrote to the prosecutor's office and offered to give information regarding Conley in exchange for benefits. Law enforcement officials then contacted Luckey. Luckey informed the police that while he and Conley were cellmates at a federal prison, Conley told him that he shot Armstrong six or seven times with a .38 caliber gun. According to Luckey, Conley said he ran out of shells, and Scott got out of the car and shot Armstrong in the head. Luckey

admitted he had access to Conley's papers and could have read his mail. Luckey also said that Conley showed him a letter from Scott referencing Conley's indictment for murder. Conley acknowledges that Luckey did not receive benefits from the State in exchange for information. However, he argues that since Luckey contacted the prosecutor's office in the hope of receiving a reduction in his prison time, the jury should have been instructed regarding the credibility of informant testimony.

The informant instruction issue is controlled by *State v. Barksdale*, 266 Kan. 498, 513-14, 973 P.2d 165 (1999) (the definition of "informant" does "not include a person who supplies information after being interviewed by police officers or who gives information as a witness during the course of the investigation"). Luckey was not acting as an informant for the State at the time he collected the "jailhouse" information. Therefore, the district court did not err by failing to give an instruction on informant testimony.

## The *Batson* Issue

Conley also contends that the State impermissibly used its peremptory challenges to keep African-Americans off his jury. The State used three of its peremptory challenges to remove three of the four African-Americans from the jury pool. Conley objected to each of the three peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, (1986). The State gave its reasons for striking the three African-Americans. The district court accepted the State's reasons as racially neutral. Conley now takes issue with the State's explanation of the three strikes.

Our standard of review is whether the district court abused its discretion in determining if the challenged strikes were constitutionally permissible. *State v. Vargas*, 260 Kan. 791, Syl. ¶ 1, 926 P.2d 223 (1996). We review the district court's findings with deference. *State v. Walston*, 256 Kan. 372, 382, 886 P.2d 349 (1994).

We now focus on the State's explanation for striking each of the challenged jurors. The State offered the following reasons for striking Y.G.: "When questioned about the testimony of a person who has been convicted of a crime, [she] was actually the first one that raised her hand. She was very emphatic that she would have a

problem believing that testimony, and that she would find that testimony suspect, regardless."

The State explained that it struck Y.O. because she arrived late to the voir dire, and she appeared to be falling asleep during jury selection. In addition, the State said, "[T]oday during questioning, she indicated that she had trouble judging a person. She would find it very difficult to sit in judgment of a person, even if the State met its burden of proof."

The State struck D.H. because he was a city employee and had "numerous contacts, if not by name, by sight with various law enforcement officers, various lab investigators. . . . [D.H.] says . . . a lot of officers, he thinks, do bad things and he doesn't agree and he might not know them until he . . . saw them by face."

First, Conley argues that Y.G. and D.H. had shared similarities with white jurors. He contends that these alleged similarities tend to show that the State struck Y.G. and D.H. because of their race. We have held that comparison-based circumstantial evidence should not be considered conclusive in every case, as a matter of law. *Walston*, 256 Kan. at 381. Conley's counsel failed to present this comparative analysis approach to the district court. Generally, "a point not raised before . . . the trial court cannot be raised for the first time on appeal." *State v. Cady*, 254 Kan. 393, 400-01, 867 P.2d 270 (1994).

Conley points out that like Y.G., R.B., a white juror, also expressed concern regarding the testimony of a convict, yet the State did not strike R.B. However, what Conley fails to acknowledge is that R.B. also said he would not automatically disregard a convict's testimony. R.B. said he was willing to "listen to it and weigh it with all the other evidence." In addition, the prosecutor pointed to three other people who were struck for the same reasons that Y.G. was struck from the jury panel. The prosecutor notified the district court that other venirepersons were struck because "they had a major problem with believing someone who had been convicted of a crime." The record supports the State's articulated reasons for striking Y.G.

Next, Conley contends that the State's reasons for striking D.H. were pretextual. D.H. worked for the City of Wichita and had some contact with police officers in the course of his employment. During voir dire, D.H. said he recognized one of the detectives from the garage where D.H. worked. In his brief, Conley asserts that one of the jury members, J.P., worked for one of the police officers listed as a witness. He makes the unsupported argument that J.P. had more contact with police officers than D.H., and yet the State did not strike J.P. from the jury. Conley fails to cite to any evidence in the record showing that J.P. worked closely with a police officer or that her business relationship with such an officer would jeopardize her ability to remain impartial.

An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the district court. In the absence of such a record, an appellate court presumes that the action of the district court was proper. *State v. Moncla*, 262 Kan. 58, 68, 936 P.2d 727 (1997). The State points out that S.H., another city employee, had numerous contacts with police officers and lab investigators. The record reflects that the State was going to strike S.H., but Conley struck her first. A reasonable person would agree with the district court's decision that the State's reasons for striking D.H. were race-neutral. The record supports each of the State's articulated reasons for striking the three jurors in question. The district court did not commit error.

### The Hard 40 Sentence

Conley contends that the evidence does not support a K.S.A. 21-4638 hard 40 sentence. We review all the sentencing evidence, viewed in the light most favorable to the State. If we conclude a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance, we must affirm. *State v. Vontress*, 266 Kan. 248, 258, 970 P.2d 42 (1998).

Under K.S.A. 21-4635, a defendant convicted of first-degree premeditated murder goes before the district court for a determination of whether a mandatory imprisonment term of 40 years is to be imposed. In making this determination, the district court considers certain statutorily defined aggravating circumstances,

such as whether "[t]he defendant committed the crime in an especially heinous, atrocious or cruel manner." K.S.A. 21-4636(f). If one or more aggravating circumstances are found to exist, and their existence is not outweighed by mitigating circumstances, the district court is required to impose the hard 40 sentence. *State v. Murillo*, 269 Kan. 281, Syl. ¶ 3, 7 P.3d 264 (2000).

Here, the district court found that the shooting death of Armstrong involved aggravating circumstances warranting a hard 40 sentence. The district judge said:

"Mr. Armstrong (the victim) was chased down, and Mr. Armstrong was shot four times. The fatal shot to the forehead between the eyes was shot at close range, execution style. Based on the facts, the court finds that the killing was committed in a heinous or cruel manner, a manner that was pitiless, and a manner that showed utter indifference to or enjoyment of the suffering of another human being."

The State offered no additional evidence at the sentencing hearing. The district court based its sentencing findings on the trial evidence.

Shooting deaths are generally not considered to be committed in an especially heinous, atrocious, or cruel manner. *State v. Brady*, 261 Kan. 109, 121-22, 929 P.2d 132 (1996). However, as Conley observes in his brief, we recognized an exception to the rule in *State v. Alford*, 257 Kan. 830, 837-38, 896 P.2d 1059 (1995). We found that the *Alford* facts supported a finding that the murder was heinous and cruel. We pointed to the following facts. Alford entered a Burger King kitchen waving his gun. He chased the victim into the lobby of the restaurant and shot her twice. He forced the victim back into the kitchen and when she attempted to escape, he shot her again. Finally, he dragged her around the corner of the kitchen, and continually tried to fire the jammed gun. After a long series of attempts to fire the gun, Alford fired the final two shots. Under those facts, we upheld a hard 40 sentence. 257 Kan. at 838. In *Brady*, 261 Kan. at 122-23, a shooting death case, we also upheld a hard 40 sentence.

Conley cites *State v. Cook*, 259 Kan. 370, 913 P.2d 97 (1996), to support his contention that the facts here do not warrant a hard 40 sentence. In *Cook*, the victim was found in his bed. The coroner testified that the victim was shot once in the chest and once in the

back. The jury found that Cook killed the victim in a particularly heinous, atrocious, or cruel manner. The district court imposed a hard 40 sentence. On appeal, we held that post-death mutilation could not be considered an aggravating circumstance. 259 Kan. at 401. Regarding the gunshots, we looked to the exceptional circumstances in *Alford*. In *Cook,* the State contended that based on his wounds, the victim either faced Cook and turned away to avoid being shot, or was shot in the back and turned to see who shot him. We concluded that a rational factfinder could not find that the shooting was committed in a special or unusual degree or to an extent greater than in other cases; thus, Cook's hard 40 sentence was inappropriate. 259 Kan. at 403.

Conley also relies on *State v. Follin,* 263 Kan. 28, 947 P.2d 8 (1997), a stabbing case. In *Follin,* a father killed his two young daughters. In holding that the killings were not "especially heinous, atrocious or cruel," we said "Follin's conduct [was] more susceptible to being interpreted as the perpetrator's avoiding infliction of serious anguish or physical abuse before the victim's death." 263 Kan. at 51. *Follin* does not advance Conley's argument here.

The testimony here, when construed in a manner favorable to the State, was that Armstrong got out of the Ford Bronco in the alley behind a warehouse. Conley stood behind the open driver's side door and shot Armstrong with a .38 caliber handgun. Armstrong started running and yelling. Conley chased Armstrong, while continuing to shoot at him. Armstrong was yelling, "Don't kill me." After firing "six or seven" times, Conley ran out of bullets. Then Scott shot Armstrong between the eyes with a .22 caliber gun. A trail of blood was found in the alley near Armstrong's body. Three of the four shots were fired from the front to the back, demonstrating that Armstrong had faced his assailant for most of the shots.

As were the victims in *Alford* and *Brady,* Armstrong was chased down. Also, it appears he was aware that as Conley fired at him, he was going to be killed. As the district judge observed, the final shot was administered in "execution style." A reasonable person could conclude that aggravating circumstances existed. The district court did not err in finding that the murder was committed in an especially heinous, atrocious, or cruel manner.

Next, Conley objects to the court's finding that the aggravating circumstances were not outweighed by mitigating factors. During sentencing, the district court considered both aggravating and mitigating factors. We will not disturb the district court's findings absent an abuse of discretion. *State v. Spain,* 269 Kan. 54, Syl. ¶ 1, 4 P.3d 621 (2000).

Conley presented the three K.S.A. 21-4637 mitigating factors: no significant history of prior criminal activity, he was an accomplice and his participation was relatively minor, and he was young. The district court found that: (1) "[Conley's] age alone does not out-weigh the aggravating factors" and (2) "there is no merit in the other mitigating factors." Conley argues that the district court should have given more weight to the mitigating factors. A review of the record shows that although Scott probably fired the fatal shot to Armstrong's forehead, Conley was much more than a "relatively minor" participant in the murder. Regarding Conley's criminal history and his age of 21, it is apparent that the district court thought the heinous manner of the crime outweighed these factors. We find no error in imposing the hard 40 sentence. See *State v. Saiz,* 269 Kan. 657, 7 P.3d 1214 (2000).

## Is the K.S.A. 21-4638 Hard 40 Sentencing Scheme Unconstitutional?

We next review Conley's contention that the K.S.A. 21-4638 hard 40 sentencing scheme is unconstitutional. Conley's constitutional claim was not presented to the district court. The State objects to consideration of the constitutional issue on appeal. Generally, "[w]hen constitutional grounds are asserted for the first time on appeal, they are not properly before [this court] for review." *State v. Shears,* 260 Kan. 823, 837, 925 P.2d 1136 (1996).

However, in *Pierce v. Board of County Commissioners,* 200 Kan. 74, 80-81, 434 P.2d 858 (1967), a constitutional issue case, we recognized three exceptions to the general rule: (1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent

the denial of fundamental rights; and (3) the district court is right for the wrong reason.

We hold that (1) and (2) above apply here and elect to address Conley's constitutional argument. We are influenced in this decision by the June 26, 2000, filing of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Conley argues that *Apprendi* applies, resulting in an unconstitutional hard 40 sentencing procedure. We disagree. The significance of *Apprendi* on sentencing issues is a subject of current discussion in both state and federal courts.

We begin our constitutional analysis by considering the relevant authorities predating *Apprendi*. Conley correctly asserts that the Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). Conley claims that during his sentencing, the district court considered facts that were not elements of the crime. According to Conley, when such facts operate to enhance his sentence, the facts must be presented to the jury in order to be proven beyond a reasonable doubt.

We have held that the standard of proof applicable to findings under K.S.A. 21-4635(c) (aggravating and mitigating circumstances) is the preponderance of the evidence. Facts " 'established for use in sentencing require less evidentiary weight than facts asserted for conviction.' [Citation omitted]." *Spain*, 263 Kan. at 713-14.

Here, the district court sentenced Conley to life imprisonment. Under K.S.A. 22-3717(b)(1), a defendant guilty of first-degree premeditated murder is generally eligible for parole after serving 25 years. However, aggravating circumstances may warrant the imposition of a sentence of mandatory imprisonment of 40 years before a defendant is eligible for parole. K.S.A. 21-4635 and K.S.A. 21-4638. Conley contends that changing the possibility of parole from 25 years to 40 years impermissibly altered the length of his sentence. His contention is based on the fact that the question of

whether certain aggravating factors existed was not presented to a jury and, thus, was not proved "beyond a reasonable doubt."

Conley recognizes that facts that do not increase a defendant's punishment beyond that authorized by the underlying statute need not be proven to a jury beyond a reasonable doubt, citing *McMillan v. Pennsylvania*, 477 U.S. 79, 88-89, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). What he fails to recognize is that *McMillan* resolves the hard 40 constitutional issue here in favor of the State.

McMillan was sentenced under Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa. Cons. Stat. § 9712 (1982) (Act). The Act provided that a person convicted of certain enumerated felonies was subject to a mandatory minimum sentence of 5 years' incarceration "if the sentencing judge finds, by a preponderance of the evidence, that the person 'visibly possessed a firearm' during the commission of the offense." 477 U.S. at 81. The Act instructed the sentencing court to consider evidence introduced at trial, as well as additional evidence offered at sentencing. The sentencing court had the discretion to impose any sentence of less than 5 years for the underlying felony; however, it could not impose a sentence in excess of the length otherwise allowed for that offense. 477 U.S. at 81-82.

The *McMillan* Court reasoned that visible possession was not an element of the crime. *McMillan* also noted that the Act, "which comes into play only after the defendant has been convicted of an enumerated felony, *neither provides for an increase in the maximum sentence for such felony nor authorizes a separate sentence*; it merely requires a minimum sentence of five years, which may be more or less than the minimum sentence that might otherwise have been imposed." (Emphasis added.) 477 U.S. at 83. The *McMillan* Court concluded that the Act was constitutional; thus, McMillan's due process argument failed. 477 U.S. at 91. McMillan's 6th Amendment right to jury trial sentencing argument also failed. 477 U.S. at 93.

Conley vaults over *McMillan*, arguing that *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999), and *Apprendi* require that in a hard 40 case, aggravating facts leading to the sentence must be "charged in the information, submitted to

a jury, and proved beyond a reasonable doubt." However, neither the reasoning in *Jones* nor in *Apprendi* leads to such a conclusion. We turn now to a review of these two cases.

In *Jones*, Jones was charged with carjacking, under 18 U.S.C. § 2119 (1988 ed., Supp. V), which provided in pertinent part: "Whoever, possessing a firearm . . . takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation . . . shall— (1) be . . . imprisoned not more than 15 years . . ., (2) if serious bodily injury . . . results, be . . . imprisoned not more than 25 years . . ., and (3) if death results, be . . . imprisoned for any number of years up to life . . . ." *Jones*, 526 U.S. at 230. Jones' indictment did not reference the subsections and did not charge the facts mentioned in (2) or (3). At trial, the jury instructions defined the car jacking offense under subsection (1) of the statute.

After Jones was found guilty, the court sentenced him to 25 years' (not 15 years) incarceration because one of the victims suffered serious bodily injury. The federal district court rejected Jones' objection that serious bodily injury was an element of the offense. The Ninth Circuit Court of Appeals agreed that subsection (2) merely set out a sentencing factor. On appeal, the United States Supreme Court found that subsections (2) and (3) provided for "steeply higher penalties" and were conditioned on further facts that seemed as important as the elements listed in the principal paragraph of the statute. 526 U.S. at 233. A review of other statutes led to the Supreme Court's conclusion that Congress "had separate and aggravated offenses in mind when it employed the scheme of numbered subsections in § 2119." 526 U.S. at 235. Thus, the Court held, a judicial factfinding by a preponderance of the evidence raised "serious constitutional questions." 526 U.S. at 251.

Unlike the facts in *Jones*, the imposition of a hard 40 sentence here does not increase Conley's life sentence. Conley was convicted of murder in the first degree, an "off-grid" person felony. K.S.A. 21-3401. Conley's maximum sentence is imprisonment for life. K.S.A. 21-4706(c). Applying the hard 40 based on a fact not found by the jury does not increase the maximum penalty. Instead, it simply limits the lower end of the sentence, which is consistent

with *McMillan*. As the Court found in *McMillan*, the judicial finding of aggravating factors "of course 'ups the ante' for a defendant, . . . but it does so only . . . by raising the minimum sentence that may be imposed by the trial court." 477 U.S. at 89.

We next consider and distinguish *Apprendi*. *Apprendi*'s reach does not extend to Conley's hard 40 sentence. Apprendi was convicted under a New Jersey statutory scheme that allowed a jury to convict a defendant of a second-degree offense based on a finding beyond a reasonable doubt that the defendant unlawfully possessed a prohibited weapon. The statute then, after a later and separate proceeding, allowed a judge to impose punishment identical to that which New Jersey provides for crimes of the first degree. The judge's finding was based on a preponderance of the evidence, that the defendant's "purpose" for unlawfully possessing the weapon was "to intimidate" his victim on the basis of a particular characteristic, such as race. New Jersey argued that the required finding of "purpose to intimidate" was not an "element" of a distinct hate crime offense, but merely a traditional "sentencing factor." The New Jersey Supreme Court affirmed. 159 N.J. 7, 731 A.2d 1265 (1999).

The United States Supreme Court, in *Apprendi*, a 5 to 4 decision, disagreed. *Apprendi* rejected the argument that the "purpose to intimidate" was merely a "sentencing factor," which could be found by the judge; the Court held this was a proper subject for jury determination beyond a reasonable doubt under the 6th Amendment to the United States Constitution. The majority, speaking through Justice Stevens, observed that the New Jersey statute mandated an examination of the defendant's state of mind. The statute, therefore, imposed, of its own force, an intent requirement necessary for the imposition of sentence. 147 L. Ed. 2d at 456. *Apprendi* said: "[T]he defendant's intent in committing a crime is perhaps as close as one might hope to come to a core criminal offense 'element.'" 147 L. Ed. 2d at 457. We read *Apprendi* to hold that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the *prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." (Emphasis added.) 147 L. Ed. 2d at 455.

Apprendi's enhanced sentence was reversed because enhancement increased the penalty for the crime beyond the prescribed statutory maximum. *Apprendi* noted, however, that it was permissible for a state to limit the sentencing court's discretion within the statutorily prescribed range, consistent with *McMillan*. 147 L. Ed. 2d at 452-53. See also, two recent cases refusing to apply *Apprendi* to sentencing factors: *U.S. v. Aguayo-Delgado*, 220 F.3d 926, 933 (8th Cir. 2000) (although drug quantity affected a sentence, the quantity was not required to have been charged in the indictment and proven to the jury beyond a reasonable doubt); *U.S. v. Smith*, 223 F.3d 554, 565 (7th Cir. 2000) (persons convicted of engaging in a continuing criminal enterprise set forth a sentencing factor, not an offense element, indictment did not have to charge fulfillment of criteria that would support enhancement).

We find the following language of *Apprendi* instructive:

"The principal dissent accuses us of today 'overruling *McMillan*.' [Citation omitted.] We do not overrule *McMillan*. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself. Conscious of the likelihood that legislative decisions may have been made in reliance on *McMillan*, we reserve for another day the question whether stare decisis considerations preclude reconsideration of its narrower holding." 147 L. Ed. 2d 453, fn. 13.

Conley invites us to follow the result reached by the Alaska Court of Appeals in *Malloy v. State*, 1 P.3d 1266 (Alaska App. 2000). We decline the invitation. *Malloy* was decided May 19, 2000. A motion for rehearing was granted June 16, 2000. *Malloy's* status awaits further clarification from Alaska's appellate courts.

### The Kansas Constitution Bill of Rights, § 5

Finally, Conley contends that under the Kansas Constitution Bill of Rights, § 5, a jury should make the fact findings associated with a hard 40 determination. He argues that the language in our Bill of Rights is more inclusive than the language found in the 6th Amendment to the United States Constitution (the right to a speedy and public jury trial in criminal prosecutions). His contention lacks merit.

Section 5 of our Bill of Rights provides: "The right of trial by jury shall be inviolate."

We have held that there is no constitutional right to a jury for a hard 40 determination. *State v. Gideon*, 257 Kan. 591, 596-99, 894 P.2d 850 (1995). The hard 40 sentencing scheme does not violate the Kansas Constitution Bill of Rights, § 5.

Affirmed.