NOT DESIGNATED FOR PUBLICATION

No. 120,675

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

DAVID JEFFREY ROYER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed September 4, 2020. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., BRUNS and POWELL, JJ.

PER CURIAM:  David Jeffrey Royer appeals his conviction of a single count of arson following a jury trial. On appeal, Royer contends that the evidence presented by the State at trial was insufficient to support his conviction. Royer also contends that the State committed prosecutorial error that denied his right to a fair trial. In addition, Royer contends that the district court's determination of his criminal history score violated section 5 of the Kansas Constitution Bill of Rights. Based on our review of the record in light of Kansas law, we do not find any reversible error. Thus, we affirm Royer's conviction.

1

FACTS

In early November 2017, Royer and Michael Hemmert lived near one another in Topeka. Both Royer and Hemmert rented houses owned by Wanda Lawson. Evidently, Royer became concerned about two women who were living in a vehicle behind Hemmert's house. Between November 5 and November 8, 2017, Royer began calling Lawson to express his concerns. However, the two were unable to connect so Royer left Lawson several voice messages on her phone. Frustrated by Lawson's failure to respond, Royer became increasingly upset, as reflected in the messages he left.

In the first message, Royer stated:

"Hey Wanda, this is David. I'm getting ready to go down and put these females out, out of 902. I'm getting ready to kick these females out of 902; if they'll answer the door. They've been messing with me all night long; and, um, this, this is no good down here. They're gonna have to go; and, uh, I'll call the police later if they don't. If I can't get them out now, I'm gonna call the police and I'm gonna have 'em put out. You might wanna come by. I'll talk to you later. Bye."

In the second message, Royer said:

"Hey Wanda. Hey, what I was saying was I'm getting ready to put these females over at 902; I'm getting ready to put 'em out, while it's still early November. And, um, if uh, they give me a problem, *I'll just, uh, call the police and, uh, have the police help. And, if we still have a problem doing that, then I'm going to light their car on fire, the car they're sleeping in, the car they're sleeping in out back. I'm gonna light that car on fire so I just thought I'd let you know.* We gotta get 'em outta here, we gotta get 'em outta here. I'm gonna, I'm gonna try to get 'em out. And, if they don't leave, if they don't leave and there's a problem when the police come, after the police leave, I'm just gonna burn 'em out. I'll see you later. Bye." (Emphasis added.)

The following day, Royer left another message:

"Hi Wanda, this is David. Did you get my message yesterday? Um, those girls next door, they're gonna have to go. They're living in a car, they're sleeping in a car out back. Uh, they messin' with me all night long every night, um, they . . . I'm . . . I need, I need your permission to kick 'em out. Um, I need you to come by too or call me . . . . "

On November 8, 2017, Royer left a fourth message:

"Hey Wanda, this is David. Are you coming by today? We gotta go down to 902. We, we have to talk to that guy. You have got to get him outta there! You have got to get him out of 902! I'm not gonna live like this, I'm not gonna listen to those people anymore Wanda!"

Later that day, Royer and Lawson where able to speak with one another on the phone. According to Lawson, Royer reiterated the concerns he had previously expressed in the voice messages that he had left. Lawson subsequently testified at trial that Royer told her that he was going to make some "needed" changes by burning the house down.

After talking to Lawson, Royer confronted Hemmert and two of his friends while they were working on a car in front of Hemmert's house. Although the facts regarding the confrontation are disputed, Royer testified at trial that he left at some point to call the police to report a weapon allegedly brandished by one of Hemmert's friends. According to Royer, after waiting for the police for a few minutes, he decided to return to Hemmert's house where the confrontation continued. The parties to the confrontation agree that a fight ensued. Hemmert and one of his friends testified at trial that when Royer left, he threw rocks at the car and yelled, "I'm gonna go get a gas can and scorch [or torch] this mother . . . ."

Shortly thereafter, Hemmert and his friends left Hemmert's house to go work on Lawson's car at her house. One of Hermmert's friends testified at trial that as he was

3

leaving, he saw Royer walking towards Hemmert's house with a red gas can. According to Royer's version of the events, he did not go back to Hemmert's house but, instead, went to a nearby grocery store to buy a snack before returning to his own house to wait for the police.

When Officer Aaron Bulmer arrived at Royer's house, Royer declined to talk about the confrontation. Because no one was home at Hemmert's house, Officer Bulmer decided to leave and write his report at a nearby park. A few minutes later, Office Bulmer noticed smoke coming from Hemmert's house and saw a fire report on his computer.

After the fire at Hemmert's house was extinguished, a Topeka Fire Department Investigator searched the premises with "Webster," an accelerant detection K-9 unit. The dog alerted to ignitable liquids in five locations around the house, including by the front door. Later, another fire investigator collected samples from the identified locations. It was later confirmed that the samples were gasoline and it was determined that the origin of the fire was just to the right of the front door. It was also determined that the cause of the fire was incendiary and not accidental.

One of the fire investigators spoke with Lawson on the day of the fire and she shared the messages that Royer had left on her phone. Two days later, the fire investigator questioned Royer and recorded their conversation. During that interview, Royer told the investigator about the confrontation at Hemmert's house and claimed that he went to a grocery store while waiting for the police to arrive. When asked directly, Royer denied going to a gas station.

During the recorded interview with the fire inspector, the following discussion occurred:

"Investigator Hanika: Did you go to the grocery store or the [Kwik] Shop?

4

"Royer: Nah, I went to, uh, the, Mike's IGA.

"Investigator Hanika: OK. Did you go to [Kwik] Shop too?

"Royer: Ummm . . . [three-second pause]

"Investigator Hanika: I need you to be honest with me.

"Royer: Did I go to [Kwik] Shop? No. I went to Mike's IGA."

When the fire investigator asked Royer where he was when the fire started, he said that he had went to a park to take a walk. Royer further indicated that he heard sirens and saw smoke coming from near his house. Specifically, Royer told the fire investigator that when he saw the smoke and heard the sirens, he decided not to go home because he thought, "they're gonna blame me for that." On February 16, 2018, after the fire investigation had been completed, the State charged Royer with one count of arson.

The district court commenced a two-day jury trial on October 9, 2018. During the trial, the State presented the testimony of Officer Bulmer, the two fire investigators, the forensic scientist who tested the samples taken from the scene of the fire, Lawson, Hemmert, and one of Hemmert's friends. In addition, 23 exhibits offered by the State were admitted into evidence. These exhibits included: Royer's messages to Lawson, the fire investigator's recorded interview with Royer, the lab report showing the presence of gasoline, and several photos of the fire damage. After the State rested, Royer exercised his right not to testify and did not call any other witnesses or offer any exhibits into evidence.

After being instructed on the law by the district court and deliberating, the jury found Royer guilty of arson. On December 7, 2018, the district court found Royer's

5

criminal history score to be A and sentenced him to 40 months in prison. Thereafter, Royer filed a timely notice of appeal.

ANALYSIS

*Issues Presented*

On appeal, Royer raises three issues. First, whether the evidence presented by the State was sufficient to support his arson conviction. Second, whether the State committed prosecutorial error during voir dire and during closing arguments. Third, whether the district court's determination of his prior criminal history violated section 5 of the Kansas Constitution Bill of Rights. For the reasons set forth below, we do not find any reversable error in this case.

*Sufficiency of the Evidence*

Royer argues that the evidence presented by the State at trial was not sufficient for the jury to find him guilty of arson beyond a reasonable doubt. When the sufficiency of the evidence is challenged, we must review the evidence in the light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). In doing so, we are not to reweigh the evidence, resolve evidentiary conflicts, or assess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

Here, the record shows that the district court appropriately instructed the jury that in order to establish that Royer committed the offense of arson in violation of K.S.A. 2019 Supp. 21-5812(a)(1), the State was required to prove the following elements beyond a reasonable doubt:

"1. The defendant knowingly, by means of fire, damaged property in which Wanda Lawson and/or Michael Hemmert had an interest, without the consent of Wanda Lawson and/or Michael Hemmert.

"2. The property was a dwelling.

"3. This act occurred on or about the 8th day of November, 2017, in Shawnee County, Kansas."

At trial, the State presented a considerable amount of evidence regarding Royer's history of conflict with Hemmert, as well as about the threats Royer made prior to the fire. In addition to witness testimony, the recorded voice messages that Royer left on Lawson's phone were admitted into evidence for the jury to consider. As such, the jurors were able to listen to Royer's own words. Also, the State presented evidence of a confrontation between Royer, Hemmert, and two of Hemmert's friends on the day of the fire. According to the testimony of witnesses, Royer threatened to "go get a gas can" and either "scorch" or "torch" Hemmert's house.

In addition, the fire investigator's recorded interview of Royer was admitted into evidence at trial. As such, the jurors, once again, were able to listen to Royer's own words. Among other things, Royer told the investigator during the interview that he went to Hemmert's house because he "wanted to know what their problem was" and that he "wanted to confront 'em." Although Royer claimed during the interview that he went to a grocery store after the confrontation with Hemmert and his friends, the jurors were also able to hear Royer's delay in answering whether he also went to the Kwik Shop where gasoline was sold.

Moreover, there was testimony from a witness indicating that he saw Royer walking back toward Hemmert's house with a red gas can shortly after the confrontation. Additionally, the State presented evidence that the investigation conducted by the Topeka

7

Fire Department concluded that the fire at Hemmert's house was intentionally set rather than accidental and that gasoline was used as an accelerant. The State also presented evidence that gasoline was found at the origin of the fire, which was just to the right of the front door of the house.

Royer suggests that the evidence presented by the State was insufficient because it was circumstantial in nature. But a conviction of even the gravest offense may be supported by circumstantial evidence if such evidence provides a basis to reasonably infer the existence of the fact in issue. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). In fact, it is not unusual for an arson conviction to be based primarily—if not exclusively—on circumstantial evidence. See, e.g., *State v. Crosby*, 182 Kan. 677, 684, 324 P.2d 197 ([1958]) ("In the very nature of things, arson is very rarely committed in the presence of others. Ordinarily arson is committed alone and in secret, and the absence of direct evidence is no bar to a conviction of the offense."). In addition, circumstantial evidence need not exclude every other reasonable conclusion to be sufficient to support a criminal conviction. *Logsdon*, 304 Kan. at 25.

Based on our review of the record on appeal in the light most favorable to the State, we find that there was sufficient evidence presented at trial upon which the jury could conclude that Royer is guilty of the crime of arson beyond a reasonable doubt. In particular, based on the evidence presented—as well as the reasonable inferences that could be drawn therefrom—the jury could conclude that Royer carried out his threats to set fire to Hemmert's house. Although no one actually saw Royer lighting the fire, the evidence presented by the State—if believed—was sufficient to prove beyond a reasonable doubt that Royer intentionally set fire to the house using gasoline.

*Prosecutorial Error*

Next, Royer argues that the State committed prosecutorial error during voir dire as well as during closing arguments, which resulted in him being denied a fair trial. When reviewing this issue, we apply the two-step test established by the Kansas Supreme Court in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). As our Supreme Court explained:

"These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012)." *Sherman*, 305 Kan. at 109.

First, Royer complains about the following statement made by the prosecutor during voir dire:

"I want to know if anybody may be familiar with the facts. In this case, Mr. Royer was charged with arson. *The crime occurred at 902 Northeast Winfield, and that happened on November 8th of 2017.* Does anybody think they might be familiar with the facts, or have driven by and saw what happened, or anything like that?" (Emphasis added.)

9

The purpose of voir dire is to question potential jurors to make sure that the jury that is ultimately sworn to hear the case is not biased or prejudiced but will hear the evidence and decide the case impartially. The goal of the district court—as well as of this court—is to ensure that a case is tried by an impartial jury free from outside influences. See *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015). A prosecutor commits error by making statements "that dilute the State's burden of proof or attempt to define reasonable doubt." *State v. Holt*, 300 Kan. 985, Syl. ¶ 4, 336 P.3d 312 (2014). However, we are to consider a prosecutor's statements to the jury in the context in which they were made rather than in isolation. *State v. Davis*, 306 Kan. 400, 413, 394 P.3d 817 (2017).

Here, when the statement made by the prosecutor during voir dire is viewed in context, we find that it was not error. The prosecutor made it clear that "Mr. Royer was *charged* with arson" but did not state that he committed arson. Although prosecutors must be careful not to dilute the State's burden of proof, the prosecutor simply mentioned the address where the fire occurred and the date on which it happened in an attempt to determine if any of the potential jurors were familiar with the facts.

Moreover, the statement that "[t]he crime occurred" was mentioned only once in passing by the prosecutor. At no point did the prosecutor suggest that the State had already proven that Royer had committed the crime of arson. When viewed in context, this statement was similar to the prosecutor saying "the fire occurred" at a certain location on a particular date.

Further, the prosecutor stated on several occasions during voir dire that it would be the State's burden throughout the trial to prove beyond a reasonable doubt that Royer was guilty of arson. Specifically, the prosecutor told the potential jurors:

> "I represent the State. The burden is on me the entire time. The burden will never shift to
> the defendant. It's never his burden to prove his innocence. It's my burden to prove him

10

guilty beyond a reasonable doubt. So my burden the whole entire case is to prove the defendant guilty beyond a reasonable doubt."

In addition to the prosecutor's statements regarding the burden of proof during voir dire, the district court also properly instructed the jury that the burden of proof was on the State to establish each of the elements of arson beyond a reasonable doubt. Likewise, the prosecutor made it clear during closing arguments that the burden of proof was on the State. Under these circumstances, we do not find that the prospective jurors were misled about the State's burden of proof. Consequently, we conclude that the prosecutor did not commit error during voir dire and, even if she had done so, we find no prejudice to Royer because the alleged error did not impact the outcome of the trial.

Next, Royer argues that the prosecutor misstated the evidence on three occasions during the State's closing argument. In particular, he points to the following section of the prosecutor's argument:

"So, what happened? David Royer went over there with gasoline. He poured the gasoline on the front door and the area of the front door and set it on fire, and that house was lit on fire.

"Something else to consider: Michael Hemmert testified that that was the only way in and out of the home. Now, when you're looking at the voicemails that the defendant left to Wanda versus what had happened, the defense is going to suggest to you that, oh, he only threatened to burn down the car. He didn't threaten to burn down the house. That's correct. We have no voicemails where he threatened to burn down the house. However, the females were sleeping in the car. *He was threatening to and fine with burning up the car with them in them—excuse me—them in the vehicle and burning it up.*

"Now, transpose that to November 8th of 2017. He, then, becomes fine with burning the house up, and not only burning it up and making good on his threats that he made earlier, these voicemails, but *he was fine with setting that fire at the only entrance*

11

*and exit to that residence. If someone would have been in the home, they would not have been able to get in and out of that door.*

"Now, you can hear from the call, and the defendant said in his statements to Officer Hanika, he was angry that morning. He had just engaged in a fight. He was upset with 902. There's girls in there messing with him. He wanted people out.

"So what did he do? He took it upon himself to get those people out. He goes over there. He's yelling at these boys. 'You can't be here. You've got to get out of here.' And a fight happens. They get in a fight. After the fight, he goes home. David—excuse me. Michael and Dorian testified that as he walked away, he said, 'I'm gonna burn this MF'er. I'm gonna torch this.' They both—at least Dorian thought he meant the house.

"Michael testified today that even though he didn't think the defendant would actually do that, he didn't think he was gonna make good on the threat, he understood that to mean the house as well.

"So what do we have? We have these previous threats to burn down the car, because he's mad at 902. Then, the day of the fire, after the fight happens, he's mad—still mad at 902, and he says, 'I'm gonna burn this MF'er down. I'm gonna torch it.' And what did he do? That's exactly what he did.

"*He went down to Mike's IGA, got some snack cakes, some pop. But what he hesitated in his interview was, 'Did you go to the Kwik Shop?'* He hesitates to answer that question to Brad Hanika. Why is that? Because he knows if he says yes, that puts him at a place that sells gas, so of course he has to say no, I wasn't there. I was only at the IGA. I only got snack cakes and pop. I didn't go anywhere that sells gas. Well, of course he's gonna say that. So he goes and gets the gas.

"*As Dorian and his friend are leaving, they see him carrying a gas can, a red, one and a half to two gallon gas can, and walk back to the home.* Officer Bulmer comes. He talks to the defendant for a few minutes, leaves, goes to the park, and then, we see the flames—or then they see the flames and respond to the fire.

12

"The defendant made good on his threat that day. He said he was gonna 'burn that MF'er down.' He said he was gonna 'torch the place.' And that's exactly what he did, and I ask you to find him guilty of arson." (Emphases added)

At the outset, it is important to remember—as the district court appropriately instructed the jury in this case—the arguments and statements of counsel are not evidence. See *State v. Cole*, 37 Kan. App. 2d 633, 636-37, 155 P.3d 739 (2007). In Kansas, prosecutors are given wide latitude in the language used during the presentation of closing arguments, so long as the statements made are consistent with the evidence admitted at trial. *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000). This wide latitude includes making reasonable inferences drawn from the evidence. *State v. Haygood*, 308 Kan. 1387, 1398, 430 P.3d 11 (2018). However, "[a] prosecutor may not misstate the law applicable to the evidence presented, may not offer a personal opinion about witness credibility, and may not shift the burden of proof to the defendant." *State v. Pribble*, 304 Kan. 824, Syl. ¶ 6, 375 P.3d 966 (2016). Further, a prosecutor may not make inflammatory remarks that improperly appeal to the jurors' sympathies or prejudices. *Holt*, 300 Kan. at 992.

Nevertheless, it is once again incumbent on us "to consider a prosecutor's comments in the context in which they are made, not in isolation." *Haygood*, 308 Kan. at 1399. In other words, we are not permitted to "isolate the challenged comments [but] consider them in the context [in which] they were made." *State v. Butler*, 307 Kan. 831, 865, 416 P.3d 116 (2018). When viewed in context—and in light of the wide latitude given to counsel—we do not find that the prosecutor committed error during closing arguments. Rather, we find that the prosecutor's statements were fair arguments based on the evidence presented at trial and the reasonable inferences that could be drawn from such evidence. See *State v. Peppers*, 294 Kan. 377, 394-96, 276 P.3d 148 (2012).

13

As indicated above, the State presented considerable evidence to the jury regarding Royer's activities prior to the fire, the threats that he had made, and the investigation of the fire. This included evidence of Royer's threat to burn the car in which the two women had been staying behind Hemmert's house. At one point, Royer even declared that unless he received help from either Lawson or the police, he would "light that car on fire" and "burn 'em out." Such evidence reasonably supports an argument by the prosecutor that Royer would carry out his threat to set the car on fire to burn out the women.

We also find the prosecutor's statement that Royer was "fine with setting the fire at the only entrance and exit" to the house—and that doing so could potentially trap someone in the house—to be fair argument based on the evidence presented at trial. The State presented photographs of the house, including the fire damage to the door. In addition, Hemmert testified that there was only one door in and out of the house. The fire investigator testified that in his opinion the origin of the fire was just to the right of the front door and that it was intentionally set. Accordingly, we find that the evidence presented was sufficient to support a reasonable inference that an intentionally set fire near the only door of a dwelling could potentially trap a person inside.

We also find the prosecutor's argument regarding whether Royer went to the Kwik Shop was fair based on the evidence presented at trial. Royer denied going anywhere that sold gas on the day of the fire. Instead, he claimed to go to an IGA grocery store. However, in a recorded interview with a fire investigator, Royer noticeably hesitated before answering when the fire investigator asked whether he also went to the Kwik Shop—which does sell gasoline—while he waited for the police to arrive.

The recording of the interview was admitted into evidence and is part of the record on appeal. On the recording, Royer can be heard letting out a long "ummm" and pausing three seconds before responding. When the investigator interjected that he needed Royer

14

to be honest with him, Royer is heard repeating the question before ultimately saying, "No. I went to Mike's IGA." When coupled with the testimony that Royer had threatened to set fire to Hemmert's house and was later seen carrying a gas can toward the house, it is not unreasonable to conclude that Royer, in fact, hesitated because he did not want to admit being at a place that sold gasoline shortly before the fire was set.

Having reviewed the prosecutor's statements and arguments in the context in which they were made, we find that they were based on the evidence presented to the jury and the reasonable inferences drawn therefrom. We also find that the prosecutor's statements did not stray outside the wide latitude afforded to the State during closing arguments. Consequently, we find no prosecutorial error.

Further, even if one or more of the prosecutor's statements or arguments were considered to constitute error, we are firmly convinced that they were harmless, particularly on account of the district court properly instructing the jury that the State maintained the burden of proof, that the case must be decided only on the evidence admitted at trial, and that the arguments of counsel were not evidence. Royer submits no evidence or argument to suggest that the jury did not heed those instructions. Thus, we conclude that there is no reasonable possibility that any of the alleged errors prejudiced Royer's right to a fair trial.

*Prior Criminal History*

Finally, Royer argues that the district court's determination of his criminal history score and the resulting sentence violated his constitutional right to a jury trial under section 5 of the Kansas Constitution Bill of Rights. It is undisputed that Royer did not present this issue to the district court. Instead, he presents it for the first time on appeal. So, we must first determine whether this issue is properly before us.

15

As a general rule, unless an issue is first presented to the district court, it is not preserved for appeal. *State v. Cheffen*, 297 Kan. 689, 696, 303 P.3d 1261 (2013). There are three exceptions to the general rule that a party cannot raise a constitutional claim for the first time on appeal. An appellate court may consider the new claim if: (1) it involves a pure legal question arising on proved or admitted facts that's finally determinative of the case, (2) considering it is necessary to serve the ends of justice or prevent the denial of fundamental rights, or (3) the district court was right for the wrong reason. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

The right to a jury trial is a fundamental right under section 5 of the Kansas Constitution Bill of Rights. *State v. Rizo*, 304 Kan. 974, 979-80, 377 P.3d 419 (2016). This constitutional right is codified in K.S.A. 22-3403(1), which requires that all felony cases be tried to a jury unless the defendant and prosecuting attorney—with the consent of the district court—submit the matter to a bench trial. Here, although Royer did not raise this issue before the district court, we may consider it nonetheless because it implicates a claim to the fundamental right to a trial by a jury. See *State v. Beaman*, 295 Kan. 853, 856-58, 286 P.3d 876 (2012). Therefore, we find that a decision on the merits would serve the ends of justice.

Turning to the merits, Royer suggests that when the Kansas Constitution—also known as the Wyandotte Constitution—was enacted in 1859, "judicial findings of an offender's prior convictions could not elevate the permissive punishment for a current crime of conviction." However, he cites no legal or historical authority for this proposition. Regardless, we note that this issue has been rejected by this court on several occasions. See, e.g., *State v. Smith*, No. 121,267, 2020 WL 3022874, at *2-4 (Kan. App. 2020) (unpublished opinion); *State v. Brown*, No. 120,590, 2020 WL 1897361, at *7-8 (Kan. App. 2020) (unpublished opinion); *State v. Billoups*, No. 120,040, 2020 WL 1969356, at *17-20 (Kan. App. 2020) (unpublished opinion).

16

Further, Royer recognizes that a panel of this court rejected a similar argument—and the Kansas Supreme Court denied review—in *State v. Valentine*, No. 119,164, 2019 WL 2306626, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. 1070 (2019). In *Valentine*, the panel recognized that the Kansas Supreme Court has consistently rejected similar challenges under the Sixth Amendment. As such, it is incumbent on a defendant to provide authority showing that our Supreme Court would interpret section 5 of the Kansas Constitution Bill of Rights to require jury findings that the Sixth Amendment does not. 2019 WL 2306626, at *6.

Although Royer acknowledges the holding in *Valentine*, he argues that the case was wrongly decided. Based on our review of Kansas law, we do not agree with Royer that *Valentine*, or the other cases in which our court has decided this issue, were wrongly decided. Instead, we find these decisions to be consistent with the Kansas Supreme Court's historical interpretation of section 5 of the Kansas Constitution Bill of Rights to be consistent with the United States Supreme Court's interpretation of the Sixth Amendment to the United States Constitution.

"[A]t least for the past half-century, [the Kansas Supreme Court] has generally adopted the United States Supreme Court's interpretation of corresponding federal constitutional provisions as the meaning of the Kansas Constitution, notwithstanding any textual, historical, or jurisprudential differences." *State v. Lawson*, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013). We recognize that there are instances in which our Supreme Court may interpret the Kansas Constitution as providing more rights than those granted in the United States Constitution. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 621, 440 P.3d 461 (2019). But we do not find this to be such a case.

In *State v. Conley*, 270 Kan. 18, 35-36, 11 P.3d 1147 (2000), the Kansas Supreme Court held that section 5 of the Kansas Constitution Bill of Rights is no more inclusive than the Sixth Amendment to the United States Constitution. Although *Conley* has been

17

overruled on other grounds, we find our Supreme Court's rejection of the argument that section 5 of the Kansas Constitution is broader than the Sixth Amendment remains good law. See *State v. Astorga*, 299 Kan. 395-36, 324 P.3d 1046 (2014). As such, we find that Royer's challenge under the Kansas Constitution fails because he provides no authority showing that the Kansas Supreme Court interprets—or would interpret—section 5 of the Kansas Constitution Bill of Rights to be more inclusive than the Sixth Amendment to the United States Constitution.

It is undisputed that both the United States Supreme Court and the Kansas Supreme Court have consistently held judicial fact-finding of a criminal defendant's prior convictions is constitutionally permissible under the Sixth Amendment. See *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 ([2000]); *State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002). Thus, we find Royer's argument that section 5 of the Kansas Constitution Bill of Rights should be interpreted to provide a greater right than that set forth in the Sixth Amendment to the United States Constitution to be unpersuasive.

Affirmed.