NOT DESIGNATED FOR PUBLICATION

No. 120,613

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EMMANUEL E. REED,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; CHRISTOPHER M. MAGANA, judge. Opinion filed April 2, 2021. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., SCHROEDER and WARNER, JJ.

ATCHESON, J.: A jury sitting in Sedgwick County District Court convicted Defendant Emmanuel E. Reed of intentional second-degree murder for gunning down Bretodd Williams shortly before noon on a spring day in 2018 as they stood on a residential street in Wichita. The jury also convicted Reed of criminal possession of a firearm. On appeal, Reed offers an array of challenges to the guilty verdicts. We affirm the murder conviction and the corresponding sentence. Because the State failed to charge Reed with conduct violating the statute criminalizing possession of firearms by some felons, we reverse that conviction and vacate the resulting sentence.

1

On appeal, Reed does not challenge the sufficiency of the evidence supporting the murder conviction. We, therefore, offer a streamlined account of the shooting and Reed's capture a short time later, recognizing the parties are conversant with the details.

A man was driving down the street in southeast Wichita to a business meeting when either Reed or Williams crossed the street in front of his truck to meet the other. Immediately afterward, the driver heard what he described as pops that sounded like firecrackers. He looked in his rearview mirror and saw one of the men lying in the street and the other running away. The driver turned around, determined the man in the street had been shot, and called 911. The driver did not recall seeing any other traffic on the street during that time.

A woman who lived in the neighborhood was in her backyard when she heard the gunshots. As she considered what to do, a man vaulted the 6-foot privacy fence, ran across the yard, and climbed over the fence on the opposite side. The family had security cameras on the house that provided a partially obstructed depiction of the shooting. Two men can be seen approaching each other and shaking hands. The time stamp obscures the gun and the shooting itself. But one of the men then runs toward the back of the woman's house. The video from a separate camera at the front of the house shows a Dodge Charger going down the adjacent street both before and after the shooting. Another resident reported seeing a Dodge Charger racing down the street where the shooting occurred moments after the gunshots. The car figures in Reed's defense, as we explain shortly.

Law enforcement officers began searching the vicinity for the gunman. Two Sedgwick County deputies saw a man matching the general description of the shooter go

2

into a convenience store. They could not locate him but found a sweatshirt in the restroom like the one the suspect wore. The officers reviewed the store's security video and saw the man wearing the sweatshirt enter and then leave with a different shirt on. They relayed that information to the other officers.

A pair of officers from the Wichita Police Department then focused their search around the convenience store. They saw Reed sitting on the curb outside a shoe store talking on his cell phone. They detained Reed, who fit the description of the shooter. After one of the sheriff's deputies confirmed that Reed was the man he saw go into the convenience store, the Wichita police officers arrested Reed.

With the assistance of a search dog, another officer found a pistol underneath an SUV parked in front of a nearby business. After examining the slugs removed from Williams' body, a ballistics expert concluded the pistol was the murder weapon. Williams had been shot four times at close range. Biological material lifted from the pistol's grip yielded several partial DNA profiles. A forensic expert determined Reed's DNA profile was consistent with one of the partial profiles. According to the expert, there was about a 1 in 700 chance the partial profile would match the DNA profile of a randomly selected person.

Investigators examined both Reed's cell phone and Williams'. The examination showed Reed and Williams had communicated with each other several times in the 36 hours leading up to the shooting. The investigators could not determine the content of their communications.

The State charged Reed with one count of intentional second-degree murder, a severity level 1 person felony violation of K.S.A. 2017 Supp. 21-5403(a)(1), and one count of criminal possession of a weapon, a severity level 8 nonperson felony violation of K.S.A. 2017 Supp. 21-6304(a)(3)(A). In the complaint, the State identified Reed's 2010

3

conviction for attempted robbery as the predicate felony supporting the criminal possession charge.

The jurors heard the case during a four-day trial in November 2018. Reed did not testify. His defense focused on the Dodge Charger traveling through the neighborhood around the time of Williams' death; his lawyer suggested Reed and Williams were the victims of a drive-by shooting. The jurors convicted Reed as charged. About six weeks later, the district court sentenced Reed to serve 653 months in prison for the murder conviction followed by 36 months of postrelease supervison, reflecting the high presumptive guidelines punishment given Reed's criminal history. The district court imposed a concurrent sentence of nine months on the firearm conviction. Reed has appealed.

LEGAL ANALYSIS

As we have indicated, Reed has asserted an array of legal challenges to his convictions. In addressing them, we add facts as necessary and ultimately find one of them warrants relief on the firearms conviction.

*Legal Adequacy of Firearms Charge and Conviction and Subject Matter Jurisdiction*

Reed disputes the legal adequacy of the charge and conviction of him for unlawfully possessing a firearm after having been convicted of a statutorily designated felony. The prohibition is set out in K.S.A. 2017 Supp. 21-6304 and lists various predicate crimes that make it illegal for a person to possess a firearm or certain other weapons. As we have said, the State charged the predicate crime as Reed's 2010 conviction for attempted robbery. Reed does not dispute the conviction.

4

But Reed correctly points out the prohibition on possession of a firearm in K.S.A. 2017 Supp. 21-6304 based on an attempted robbery conviction expires after five years. K.S.A. 2017 Supp. 21-6304(a)(2) (five-year prohibition based on felony other than one identified in [a][3][A]); K.S.A. 2017 Supp. 21-6304(a)(3)(A) (10-year prohibition based on aggravated robbery or attempted aggravated robbery among other designated crimes). Here, there was more than a seven-year gap:  Reed was convicted of the attempted robbery on December 6, 2010; and the shooting happened on May 2, 2018. The State, therefore, charged and then tried and convicted Reed of something that is not a statutory crime in Kansas. That's not supposed to happen. See K.S.A. 2020 Supp. 21-5103(a) ("No conduct constitutes a crime against the state of Kansas unless it is made criminal in this code or in another statute of this state . . . ."); *State v. Sexton*, 232 Kan. 539, Syl. ¶ 1, 657 P.2d 43 (1983) ("There are no common law crimes in this state, and there can be no conviction except for such crimes as are defined by statute.").

Reed contends the district court lacked subject matter jurisdiction to try him for what amounted to a crime that doesn't exist. He alternatively argues the State presented insufficient evidence to convict him. The State concedes Reed's conviction for unlawful possession of a firearm to be erroneous and sizes up the problem as insufficiency of the evidence. We agree Reed's conviction and sentence cannot stand however the deficiency may be characterized.

Shortly before Reed's prosecution, the Kansas Supreme Court exhaustively surveyed the law on subject matter jurisdiction and defective complaints in criminal cases and recalibrated how those defects should be assessed. See *State v. Dunn*, 304 Kan. 773, 774-75, 375 P.3d 332 (2016). The discussion in *Dunn* guides our assessment of the error here. The *Dunn* decision recognized that district courts derive subject matter jurisdiction over criminal cases from the Kansas Constitution and cognate jurisdictional statutes rather than from the complaint or another charging instrument initiating a given prosecution. In turn, a complaint that endeavors to charge a crime but is sloppy,

5

incomplete, or even inaccurate does not negate a district court's subject matter jurisdiction. 304 Kan. at 813-14. Those sorts of deficiencies may compromise a defendant's due process rights or other constitutional protections, but they are often correctable or ultimately harmless. The lack of subject matter jurisdiction is neither, since it goes to the judicial authority of the court to decide a case. Any conviction rendered in the absence of subject matter jurisdiction is void. 304 Kan. at 784.

Whether a district court has subject matter jurisdiction presents a question of law. *Via Christi Hospitals Wichita v. Kan-Pak*, 310 Kan. 883, 889, 451 P.3d 459 (2019). As outlined in *Dunn*, district courts derive their general judicial authority from article 3, sections 1 and 6(b) of the Kansas Constitution and their grant in K.S.A. 22-2601 of "'exclusive jurisdiction to try all cases of felony and other criminal cases arising under the statutes of the state of Kansas.'" *Dunn*, 304 Kan. at 789. By obvious negative implication and force of logic, a district court has no jurisdiction to try someone at the State's behest for something that is not a statutory crime. And the ostensible charge against Reed for unlawfully possessing a firearm falls in that category. What the complaint purported to charge against Reed for possessing a firearm simply was not a crime. The district court had no subject matter jurisdiction for that reason—not because of some defect in the form of the complaint itself. See *Dunn*, 304 Kan. at 787-88.

The bulk of the discussion in *Dunn* focused on how to handle deficiencies in a complaint that seeks to charge an actual crime but does so incompletely or otherwise poorly. Those defects include: (1) misidentifying the district court in which venue lies, assuming the case has been filed in the proper judicial district; (2) omission of a fact or facts supporting a statutory element of the crime; and (3) otherwise failing to give a defendant constitutionally adequate due-process notice of the charged crime. 304 Kan. at 816-17. Those deficiencies entail drafting errors in the charging instrument in the sense some material component has been garbled or left out. The errors do not deprive a district court of subject matter jurisdiction over a criminal case.

6

But those considerations are inapposite here. The flaw in the charge against Reed for unlawful possession of a firearm is not a defect in the form or language of the complaint. The complaint is complete and coherent. The problem is more fundamental— notwithstanding its completeness and coherence, the complaint seeks to prosecute Reed for conduct on his part that is not criminal. And, as we have explained, district courts do not have the authority to put a person on trial at the State's request for something that is not crime.

The proper remedy here requires that Reed's conviction for unlawful possession of a firearm be reversed and his sentence vacated. Everybody seems to agree on that much. The remedy is consistent with K.S.A. 2020 Supp. 22-3502 and K.S.A. 22-3503 governing the arrest of a judgment when a complaint fails to charge a crime. In addition, we remand to the district court with directions to dismiss count 2 of the complaint setting forth the firearms charge. The district court may do so by order without a hearing, since we consider the dismissal to be a nondiscretionary function. If the State had charged a crime in the complaint and then presented insufficient evidence to prove the crime at trial, we would also enter a judgment of acquittal for Reed. See *Tibbs v. Florida*, 457 U.S. 31, 40-41, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982); *State v. Hollins*, 9 Kan. App. 2d 487, 489-90, 681 P.2d 687 (1984). Because both the district court and we lack jurisdiction over the firearms charge that's not a crime, we suppose we have no more authority to enter a judgment of acquittal than we would to affirm a judgment of conviction. Reversing the conviction, vacating the sentence, and dismissing the charge appear to afford Reed a complete remedy under the circumstances.

Since we have otherwise reversed Reed's conviction for unlawful possession of a firearm, we do not take up his alternative argument that K.S.A. 2017 Supp. 21-6304 violates § 4 of the Kansas Constitution Bill of Rights, thereby negating the charge. See *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46, 108 S. Ct.

1319, 99 L. Ed. 2d 534 (1988) (Courts should "avoid reaching constitutional questions in advance of the necessity of deciding them.").

Reed argues the district court's lack of subject matter jurisdiction over the firearms charge in turn undercuts his conviction for second-degree murder. We are unpersuaded. The absence of subject matter jurisdiction as to some claims or counts in a case is not a contagious disease that infects those claims or counts for which a district court properly has jurisdiction. Reed offers neither sound argument nor apt authority for the proposition he advances.

To start, Reed equates lack of jurisdiction to a structural error in a criminal prosecution and argues the entire case must fail. To make the contention work, he suggests the absence of district court jurisdiction over one count of a multicount complaint is like having a presiding judicial officer who is biased against him. A trial judge prejudiced against a criminal defendant injects structural error into the proceedings. See *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); *State v. Daniels*, 278 Kan. 53, 61, 91 P.3d 1147 (2004). A structural error requires the reversal of any convictions regardless of demonstrable prejudice because it impermissibly corrupts the proceedings in a way that defies review for harmlessness. *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *Miller v. State*, 298 Kan. 921, 935, 318 P.3d 155 (2014). But the analogy to this case is, to say the least, strained. Quite obviously, a trial judge acting with partiality necessarily contaminates the whole of the proceedings over which he or she presides. Here, Reed was properly charged with intentional second-degree murder—he doesn't claim otherwise. That count of the complaint stands independently of the failed firearms count. Nothing about the firearms charge diminishes or compromises the murder charge.

Reed similarly fails to fashion sound support for his legal position out of *Gomez v. United States*, 490 U.S. 858, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989). In that federal

criminal case involving multiple felony charges, a magistrate judge conducted jury selection ostensibly under a catch-all provision of the statute delineating the authority of magistrate judges. Gomez objected and argued an Article III district court judge had to preside. The Court held that magistrate judges lacked the authority to oversee jury selection in felony cases and the error could not be excused as harmless because criminal defendants possess a "basic . . . right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside." 490 U.S. at 876. The magistrate judge's involvement exceeded that authority and compromised the trial, even though Gomez pointed to no tangible prejudice flowing from the jury selection.

Again, we fail to see an apt analogy. If a judicial officer without *any* authority to act presides over a trial or some portion of a trial, the error—whether it is subject to review for harmlessness or not—necessarily touches every legal claim at issue. The effect is horizontal, cutting across the litigation. But the circumstances here are plainly distinguishable. The district court had subject matter jurisdiction over the second-degree murder charge and full legal authority to preside over every aspect of the prosecution of that claim. Conversely, the district court's lack of jurisdiction and authority over the firearms charge was purely vertical, affecting only that charge and its disposition.

In short, Reed has failed to offer a convincing argument that the district court's lack of subject matter jurisdiction over the firearms charge had any real (or even hypothetical) impact on the adjudication of the second-degree murder charge.

*State's Exercise of Peremptory Challenges in Jury Selection*

In the district court, Reed's lawyer objected to the State's use of a peremptory challenge to excuse a 19-year-old African-American man from the pool of potential jurors. The lawyer cited *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the seminal case precluding the government's use of peremptory challenges to

9

exclude potential jurors based on their race in criminal cases as a violation of the Fourteenth Amendment to the United States Constitution. Loosely consistent with the analytical method for resolving *Batson* objections, the district court invited the prosecutor to state the reasons the potential juror was excluded. The prosecutor cited the man's youth, lack of employment, and incomplete responses to some questions the lawyers asked during the jury selection process. The prosecutor pointed out that the State exercised peremptory challenges to excuse two Caucasian women who were 23 and 24 years old. The district court noted that two African-Americans remained in the jury pool and denied the objection without giving Reed's lawyer a chance to respond. The lawyer, however, did not request the opportunity to speak to the State's articulated reasons. The appellate record established the State did not remove either of the remaining African-Americans, and both of them sat as jurors. Reed is African-American.

On appeal, Reed shifts constitutional gears and asserts the State violated his rights protected in § 1 of the Kansas Constitution Bill of Rights by excusing the African-American juror. We assume without deciding that Reed's argument under the Kansas Constitution is properly before us, even though that ground was not identified in the district court and is not inherent in a *Batson* objection based on federal law.

The language of § 1 accords "[a]ll men . . . equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness" and, thereby, seems to constitutionalize a narrow set of rights so fundamental they otherwise transcend forms of government. The framers of the Kansas Constitution adapted the section from a passage in the Declaration of Independence in which Thomas Jefferson set down his version of Lockean natural rights. By 1859, when that portion of the Kansas Constitution was written, inalienable rights had become a rallying cry for abolitionists and the newly formed Republican Party in opposing the spread of slavery. And the framers of the Kansas Constitution debated § 1 in that context. Reed, therefore, suggests § 1 affords him a more robust right than the Court recognized in *Batson* under the Fourteenth

Amendment. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, Syl. ¶ 6, 440 P.3d 461 (2019).

But Reed also suggests § 1 includes something comparable to the Equal Protection Clause of the Fourteenth Amendment. The Kansas Supreme Court has regularly described § 1 and § 2 of the Kansas Constitution Bill of Rights in tandem as providing protections like the Equal Protection and Due Process Clauses of the Fourteenth Amendment without elaborate explanation. See *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005); *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974). For purposes of deciding this appeal, we assume the premise of Reed's construction of § 1 as including an equal protection right in addition to the explicitly identified inalienable natural rights. The distinct equal protection right Reed imputes to § 1 would, then, be legally comparable to the Equal Protection Clause of Fourteenth Amendment. The Kansas Supreme Court has consistently recognized that state constitutional rights with counterparts in the federal constitution should be construed to be equivalent. See *State v. Zwickl*, 306 Kan. 286, 291, 393 P.3d 621 (2017) (prohibition on unreasonable government searches and seizures); *Limon*, 280 Kan. at 283-84 (equal protection rights); see also *Alpha Medical Clinic v. Anderson*, 280 Kan. 903, 920, 128 P.3d 364 (2006) (Kansas Constitution typically construed "to echo" comparable provisions of United States Constitution). So federal precedent offers highly persuasive guidance in their construction and application.

In *Batson*, the Court recognized twin equal protection considerations supporting a prohibition on the State's use of racially based peremptory challenges or juror strikes. First, defendants are denied the right to equal protection if the State seeks to try them before juries "from which members of [their] race have been purposefully excluded." 476 U.S. at 85. Just as important, however, citizens called for jury duty have a constitutional right to serve if they are otherwise qualified. The State violates that right when a prosecutor eliminates them during the jury selection process because of their race. 476

11

U.S. at 87. Exclusion of citizens from jury service based on race reflects "a primary example of the evil the Fourteenth Amendment was designed to cure." 476 U.S. at 85; see *Miller-El v. Dretke*, 545 U.S. 231, 237-38, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (noting the dual equal protection violations attendant to the State's race-based removal of potential jurors during the selection process).[*]

[*]In the interest of completeness, we point out the Court has extended the rule of *Batson* to permutations of the essential fact pattern present there and here—the State's ostensible use of peremptory strikes to remove African-Americans from the jury pool in the trial of an African-American defendant on criminal charges. For example, a Caucasian defendant may assert a *Batson* challenge to the prosecutor's apparently deliberate removal of African-Americans called as jurors in a criminal case. *Powers v. Ohio*, 499 U.S. 400, 415-16, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). The State may challenge a defendant's use of peremptory challenges in what appears to be a racially motivated fashion. *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992). The Court has recognized that Hispanics reflect a sufficiently identifiable racial or ethnic group to be protected by the *Batson* rule. *Hernandez v. New York*, 500 U.S. 352, 355, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (prosecutor's deliberate exclusion of Hispanics from jury would violate Equal Protection Clause). The Court has also extended the principle underlying *Batson* to the State's systematic exclusion of women from juries based on gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). Likewise, neither plaintiffs nor defendants in civil cases may purposefully strike potential jurors because of their race. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

We are not disposed to see in § 1 an extensive buffet of inalienable rights extended to criminal defendants of such particularity and specificity that some of them regulate details of how jury trials should be conducted, including the manner of selecting the jurors, receiving evidence, and even rendering judgments. Regulation of governmental mechanisms, such as the judicial process, is undeniably important and necessarily implicates certain constitutional rights. But those mechanisms do not exist inherently outside of or beyond the institutions of governance and, therefore, presumably neither create nor command natural or inalienable rights. By the same token, however, governmental institutions cannot diminish those inalienable rights, except in especially compelling circumstances. See *Hodes & Nauser*, 309 Kan. at 669.

Given the time and place § 1 was written and adopted, we are far more inclined to say those inalienable rights do permit African-Americans to serve on juries free of race-based discrimination excluding them from that service. Section 1 was aimed at ending slavery and government endorsement of involuntary servitude impressed upon a class of people and their descendants defined essentially by race. There would seem to be no gross distortion of § 1 in holding government sanctioned exclusion of African-Americans from jury service represents a denial of self-determination, as a component of the inalienable right of liberty, and effects a continuing badge of slavery. As the *Batson* Court recognized, individuals excluded from jury service based on race have no practical way to vindicate their own right to be free of such discrimination, so criminal defendants may, by proxy, lodge objections on their behalf. Without much trepidation, we suppose that to be sensible under § 1, as well. Reed, therefore, could make an objection for the African-American man the prosecutor dismissed from the jury pool.

What remains is how to assess a putative violation of the § 1 inalienable right of a prospective juror to serve and the separate § 1 equal protection rights of both prospective jurors and criminal defendants to a jury selection process free of racial discrimination. In *Batson* and later cases, the Court has used a three-step process to determine if a lawyer has exercised peremptory challenges based on racial animus. The analytical framework draws on the model developed in employment discrimination cases to probe an employer's intent in hiring, firing, promoting, or otherwise making workplace decisions. *Johnson v. California*, 545 U.S. 162, 170-71 & n.7, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). Because purposeful racial discrimination typically is difficult to prove—seldom will the discriminatory actor admit the illicit purpose—the approach imposes shifting burdens of production of circumstantial evidence. *Foster v. Chatman*, 578 U.S. ___, 136 S. Ct. 1737, 1747, 195 L. Ed. 2d 1 (2016); *State v. Gonzalez*, 311 Kan. 281, 302-03, 460 P.3d 348 (2020).

The *Gonzalez* court recently detailed the sequential evidentiary process. 311 Kan. at 302-03. Here Reed, as the party challenging the peremptory removal of a potential juror, was obligated to make a prima facie showing of impermissible discriminatory intent on the part of the prosecutor. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168; *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012). The burden at the first stage is not intended to be onerous. *Johnson*, 545 U.S. at 170. The prosecutor should then offer a race-neutral reason for the decision. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168; *McCullough*, 293 Kan. at 992. Again, the burden at that second stage is slight. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995). Assuming the prosecutor has done so, the district court should move to the third step and examine all relevant evidence bearing on the true intent behind the peremptory strike of the prospective juror. See *Miller-El*, 545 U.S. at 253; *State v. Williams*, 308 Kan. 1320, 1329-30, 429 P.3d 201 (2018). Reed bore the ultimate burden of persuasion to show by a preponderance of the evidence that the prosecutor removed the prospective juror because of his race. See *Gonzalez*, 311 Kan. at 303; see also *Crittenden v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010); *United States v. Martinez*, 621 F.3d 101, 109 (2d Cir. 2010).

The Kansas Supreme Court has repeatedly embraced this method of proof. *Gonzalez*, 311 Kan. at 302-03; *Williams*, 308 Kan. at 1328. We have no reason to believe the court would stake out a different approach under § 1.

Here, the district court applied a truncated version of the three-stage evidentiary test probing racial discrimination in the use of peremptory strikes. It dispensed with an assessment of Reed's prima facie evidence and proceeded immediately to the second stage. The prosecutor provided not only race-neutral reasons for the decision to strike the young African-American but identified roughly age-comparable Caucasians he also peremptorily removed—spilling over into the third-stage proof. The district court, however, did not allow Reed to respond before denying the *Batson* objection with its own additional observation that two other African-Americans remained in the pool of

14

prospective jurors. Reed did not protest how the district court handled the objection at the time; nor does he now.

Although the district court might have been more systematic in how it dealt with Reed's *Batson* objection, we find no fault with its ultimate conclusion. The prosecutor offered race-neutral reasons tied to the juror's situation—youth, unemployment, and an apparent reluctance to respond fully to the lawyers' questions. The prosecutor pointed to other similarly youthful Caucasians he peremptorily excused. The prosecutor did not use later peremptory strikes to remove two other African-Americans from the pool, and they ultimately served on the jury. Without belaboring the record, the circumstances do not establish racial animus as a reason for the prosecutor's decision to strike the potential juror consistent with the *Batson* framework. On appeal, Reed does not directly argue otherwise.

Reed contends the Kansas appellate courts should adopt a different evidentiary method for evaluating the use of peremptory jury strikes as a violation of § 1. As we have indicated, we do not believe we have the liberty to do so, given the Kansas Supreme Court's recent and essentially unequivocal adherence to the *Batson* framework, albeit in furtherance of equal protection rights under the Fourteenth Amendment.

The *Batson* approach has drawn criticism as a tool that is far too often ineffective in identifying the racially motivated use of peremptory juror strikes. See, e.g., *Miller-El*, 545 U.S. at 266-69 (Breyer, J., concurring); *State v. Saintcalle*, 178 Wash. 2d 34, 43-46, 309 P.3d 326 (2013); Frampton, *For Cause: Rethinking Racial Exclusion and the American Jury*, 118 Mich. L. Rev. 785, 786-88 (2020). Reed submits we should adopt an analytical test the Washington Supreme Court fashioned in *State v. Jefferson*, 192 Wash. 2d 225, 229-30, 429 P.3d 467 (2018), to replace the *Batson* model. The *Jefferson* test shifts the ultimate issue from whether the party removing the potential juror was motivated by racial animus or discriminatory intent to whether an objective observer

15

would conclude race "was a factor" in the decision. 192 Wash. 2d at 229-30. The standard is considerably less demanding.

We would not necessarily be disposed to turn to *Jefferson* to replace the final step of the three-part *Batson* model even if we were free to do so. The *Jefferson* court was divided and issued three opinions addressing the point. And the Washington Supreme Court has since superseded *Jefferson* with a court rule governing the use of and challenges to peremptory jury strikes that has a comparable purpose but operates somewhat differently by describing the characteristics of the hypothesized "objective observer," identifying a nonexclusive list of factors a district court should consider in ruling on an objection to a peremptory strike, and recognizing "presumptively invalid" reasons for exercising peremptory strikes. Wash. R. Gen. Application 37.

Moreover, we are disinclined to apply the *Jefferson* evidentiary standard to the record here in what would be an abstract appellate exercise. The record, however, does not cultivate a picture of race as a motivating factor in the prosecutor's decision to excuse the potential juror. We find no error in the district court's decision to deny the *Baston* objection.

*Prosecutorial Error*

Reed submits the prosecutor made improper comments during his opening statement and the rebuttal portion of the closing arguments to the jury and those remarks sufficiently tainted the trial to require reversal of the guilty verdicts. We find the prosecutor's opening statement included impermissible autobiographical information that served no legitimate purpose. Those remarks created error. In the challenged part of the closing argument, the prosecutor made a pair of blunt and unflattering characterizations of Reed. They were, however, fair comments on the evidence and, therefore, not error. On balance, Reed's right to a fair trial was not compromised.

16

We examine prosecutorial error with a revamped standard the Kansas Supreme Court initially outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). The analytical model first considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Comments made during opening statements or closing arguments will be considered error if they fall outside the wide latitude afforded a prosecutor in discussing the evidence and the law. 305 Kan. at 109. This simply transplanted the initial step in the former process, though substituting the term "error" for "misconduct," a more pejorative label at least connoting a deliberate violation of the rules even when there might be only an inadvertent mistake. 305 Kan. at 104-05.

If an appellate court finds the challenged argument to be prosecutorial error, it must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109. The prejudice analysis in *Sherman* replaced a multifactor standard that also considered the prosecutor's bad intent or ill will—breaches of professional conduct the court concluded could be more appropriately addressed in ways other than reversing a conviction in the absence of material prejudice. 305 Kan. at 114-15.

An opening statement to the jury affords lawyers the chance to outline what they anticipate the evidence will show and how that evidence fits with their theory of the case. See *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017). While lawyers enjoy some latitude in crafting opening remarks, they typically should avoid elaborate and repeated

17

rhetorical flourishes promoting their desired outcomes—advocacy more properly undertaken in closing arguments after the jurors have heard the evidence and have been instructed on the law. Whatever the proper tenor and content of an opening statement compared to a closing argument, it is not an occasion for excursions beyond the expected evidence into otherwise intriguing or ingratiating topics.

Here, the prosecutor offered paired comments of a kind that strayed sufficiently from the proper realm of opening statements to be error. After introducing himself, the prosecutor told the jurors about his experience as an assistant district attorney, his time in the military with the JAG Corps, and his continued service in the Army Reserves. Lawyers should refrain from discussing their professional "credentials" or autobiographical facts—such as military service—that would tend to engender goodwill from some or many jurors. A contrary rule would effectively invite lawyers to tout themselves in front of jurors in distracting and entirely irrelevant promotions more suited to political candidates on the hustings. That said, we fail to see discernible prejudice to Reed under the circumstances and, therefore, have no basis for disturbing the guilty verdicts. As the *Sherman* court made clear, the remedy for this sort of error would lie elsewhere. 305 Kan. at 114-15.

Later in the opening statement, the prosecutor alluded to being frazzled because he has teenaged daughters. We see the comment to be error, too, although perhaps less clearly so than the prosecutor's sketch of his professional background. Many parents find their teenagers to be exasperating from time to time. We suppose the prosecutor's status as a parent or as an occasionally distracted parent would not especially sway the jurors. Despite the lack of apparent prejudice to Reed, this sort of commentary is quite removed from the purpose of an opening statement and has no place there.

In some narrow circumstances, perhaps in response to a prospective juror during voir dire, a lawyer permissibly might mention in passing having served in the military or

18

sharing a home with teenagers. We do not intend to suggest that sort of limited give-and-take to be categorically off-limits or improper.

Turning to the prosecutor's closing argument, we point out lawyers then have the chance to discuss how the jurors should evaluate the evidence and how that evidence should guide them to a verdict consistent with the law outlined in the district court's instructions. Advocates are expected to use the opportunity to their respective client's advantage and have "wide latitude" in drawing inferences from the evidence and in fashioning rhetorically striking arguments. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009); *State v. Rodriguez*, 269 Kan. 633, 643, 8 P.3d 712 (2000) (closing argument not improper simply because of "impassioned . . . oratory" or "picturesque speech"). Prosecutors may exercise that latitude consistent with their ultimate duty in ensuring the fundamentally fair adjudication of criminal defendants. *Sherman*, 305 Kan. at 109 (wide latitude extended prosecutors must be exercised within duty "to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial"); *State v. Pabst*, 268 Kan. 501, Syl. ¶ 6, 996 P.2d 321 (2000) (overarching "interest" of State, and its legal representative, in criminal prosecution "is not that it shall win a case, but that justice shall be done").

In the rebuttal portion of his argument, the prosecutor responded to Reed's theory of defense that both he and Williams were caught in a drive-by shooting. The prosecutor explained to the jurors that to credit the theory, one must conclude Reed left his friend to bleed-out on the street rather than seeking help. That's true. At no point did Reed call 911 or otherwise try to aid Williams even after he personally would have been out of immediate danger. So that cuts against the credibility of Reed's version of how Williams died—the focal point of the prosecutor's explanation. Reed contends the prosecutor's remarks make him look craven and cowardly. They do, and they are fair comment on the evidence, especially given the defense Reed advanced at trial. We find neither error nor unfair prejudice.

19

In the same general part of the rebuttal, the prosecutor told the jurors, "The facts show [Reed]'s a cold-blooded killer." As Reed suggests, we find the characterization to be blunt and brutal. But so was the murder on the State's evidence: Reed intentionally shot Williams four times apparently without any provocation and then fled. The evidence depicted a deliberate homicide carried out with a lethal weapon. Nothing suggested Reed acted in the heat of passion or on a sudden quarrel—fevered states of mind—that would mitigate an otherwise intentional second-degree murder to a less culpable voluntary manslaughter. Under any version of the case, Williams died at the hand of a cold-blooded killer, be it Reed or the drive-by shooter. The prosecutor offered no more than fair comment on the evidence.

We find no reversible error in the prosecutor's comments in either opening statement or closing argument.

*Use of Reed's Past Convictions in Determining Criminal History for Sentencing*

Reed contends that using his past convictions to establish his criminal history category without having proved them to a jury violates his rights under § 5 of the Kansas Constitution Bill of Rights. The argument is premised on the idea that past criminal conduct used to enhance punishment for a current conviction had to be presented to juries at common law in Kansas and, therefore, comes within the protection of the right to jury trial found in § 5. Reed's position is flawed, and this court has consistently rejected the point. See *State v. Albano*, 58 Kan. App. 2d 117, 126-29, 464 P.3d 332 (2020), *rev. granted* 312 Kan. ___ (September 30, 2020); *State v. Royer*, No. 120,675, 2020 WL 5268042, at *9 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* October 2, 2020; *State v. Cisneros*, No. 121,675, 2020 WL 5083321, at *3 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* September 24, 2020); *State v. Deleon*, No. 121,407, 2020 WL 4909708, at *3-4 (Kan. App. 2020) (unpublished opinion), *petition for*

20

*rev. filed* September 21, 2020; *State v. Rumold*, No. 121,038, 2020 WL 4722328, at *12-13 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* September 11, 2020; *State v. Siebold*, No. 121,291, 2020 WL 4379031, at *2 (Kan. App. 2020) (unpublished opinion); *State v. Hollon*, No. 121,476, 2020 WL 3885912, at *3-4 (Kan. App. 2020) (unpublished opinion), *rev. granted* 312 Kan. __ (September 30, 2020); *State v. Hayes*, No. 120,801, 2020 WL 3579871, at *4 (Kan. App. 2020) (unpublished opinion); *State v. Lovett*, No. 121,287, 2020 WL 3579874, at *3 (Kan. App. 2020) (unpublished opinion), *rev. granted* 312 Kan. __ (September 30, 2020); *State v. Smith*, No. 121,267, 2020 WL 3022874, at *2-4 (Kan. App. 2020) (unpublished opinion), *rev. granted* 312 Kan. __ (September 30, 2020); *State v. Brown*, No. 120,590, 2020 WL 1897361, at *7-8 (Kan. App. 2020) (unpublished opinion), *rev. granted* 312 Kan. __ (September 30, 2020); *State v. Billoups*, No. 120,040, 2020 WL 1969356, at *17-20 (Kan. App. 2020) (unpublished opinion), *rev. denied* 312 Kan. __ (September 23, 2020); *State v. Davis*, No. 121,662, 2020 WL 3579911, at *1, 3-4 (Kan. App. 2020 ) (unpublished opinion), *rev. granted* 312 Kan. __ (September 30, 2020); *State v. Valentine*, No. 119,164, 2019 WL 2306626, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. 1070 (2019).

We decline to depart from those cases. The Kansas Supreme Court has construed § 5 to confer no greater rights on a criminal defendant than does the right to jury trial in Sixth Amendment to the United States Constitution. *State v. Conley*, 270 Kan. 18, 36, 11 P.3d 1147 (2000). On that point, *Conley* remains good law, and we are obligated to follow it. The United States Supreme Court has rejected a comparable argument on establishing the fact of past convictions for sentencing purposes premised on the Sixth Amendment. See *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (Any fact other than an earlier conviction that would elevate a criminal defendant's sentence above a statutory maximum punishment must be submitted to a jury and proved beyond a reasonable doubt.). Relying on *Apprendi* and its application in later cases, the Kansas Supreme Court has consistently held that the State's sentencing scheme, including the determination of a defendant's criminal history, does not violate the Sixth

Amendment right to jury trial. *State v. Razzaq*, 309 Kan. 544, 552, 439 P.3d 903 (2019); *State v. Pribble*, 304 Kan. 824, 838-39, 375 P.3d 966 (2016); *State v. Fischer*, 288 Kan. 470, Syl. ¶ 4, 203 P.3d 1269 (2009); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). Collectively, that authority dismantles Reed's argument under § 5.

We find no error in the district court's determination of Reed's criminal history category and the resulting sentence for intentional second-degree murder.

*Conclusion*

The district court lacked subject matter jurisdiction to try and convict Reed for criminal possession of a firearm predicated on his earlier conviction for attempted robbery. We, therefore, reverse the conviction, vacate the sentence, and remand to the district court with directions to dismiss that count of the complaint filed against Reed.

Reed has failed to show any reversible error affecting his conviction and sentence for intentional second-degree murder. We affirm them.

Affirmed in part, reversed in part, vacated in part, and remanded to the district court with directions.